IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CHAVEZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JORGE CHAVEZ, APPELLANT.

Filed November 29, 2016.    No. A-15-1154.

Appeal from the District Court for Clay County: VICKY L. JOHNSON, Judge. Affirmed.

Daniel S. Reeker, of Kendall Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and PIRTLE, Judge, and MCCORMACK, Retired Justice.

MOORE, Chief Judge.

## I. INTRODUCTION

Jorge Chavez appeals from his conviction in the district court for Clay County for three counts of third degree sexual assault of a child. On appeal, Chavez challenges the admission of certain testimony from a nonexpert witness, the sufficiency of the evidence to support his conviction, and the sentences imposed. He also asserts that he received ineffective assistance of trial counsel. For the reasons set forth herein, we affirm.

## II. BACKGROUND

### 1. INFORMATION

On March 24, 2015, the State filed an information in the district court, charging Chavez with one count of attempted first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01 (Cum. Supp. 2014) and Neb. Rev. Stat. § 28-201 (Cum. Supp. 2014), a Class II felony. The State also charged Chavez with three counts of third degree sexual assault of a child, all

Class IIIA felonies, although the State incorrectly identified these offenses as being in violation of § 28-319.01, rather than Neb. Rev. Stat. § 28-320.01 (Reissue 2008), the statute which sets forth the elements and penalties for second and third degree sexual assault of a child. Specifically, with respect to the first count, the State alleged that Chavez intentionally engaged in conduct, which under the circumstances as he believed them to be, constituted a substantial step in a course of conduct intended to culminate in his commission of the crime of sexual assault of a child by sexual penetration when he was at least 19 years of age and when the victim, N.F., was under 12 years of age or when N.F. was at least 12 but less than 16 and Chavez was 25 years of age or older. With respect to the other three counts, the State alleged that Chavez subjected N.F., a person 14 years of age or younger at the time of the act, to sexual contact while Chavez was 19 years of age or older in the living room, Chavez' bedroom, and in the basement.

2. BENCH TRIAL

A bench trial was held before the district court on September 23, 2015.

During the trial, the parties stipulated that Chavez was born in April 1970. N.F., born in January 2003, was 12 years old at the time of trial and was in the seventh grade. N.F. has one older brother, who was 15 years old at the time of trial, and a younger brother and sister, ages 10 and 8, respectively. N.F.'s parents separated in 2009 and divorced in 2010 or 2011. N.F.'s mother married Chavez in November 2012. N.F.'s mother and Chavez have two children together, boys ages 4 and 3 at the time of trial. After their parents' divorce, N.F. and her siblings lived with their mother and had visitation with their father for two days every 2 weeks, but they had been living with their father for close to 9 months at the time of trial. Chavez worked with N.F.'s father, and he lived with N.F.'s parents for about 3 years prior to the divorce.

N.F. lived in what she described as "the brown house" with Chavez, her mother, and her siblings when she was in fifth and sixth grade. The family moved into the brown house in approximately January 2013. The brown house had two bedrooms. N.F.'s mother and Chavez slept in one bedroom, and N.F.'s full brothers shared the other bedroom. N.F.'s youngest half-brother slept with Chavez and N.F.'s mother. N.F. slept on the floor, her sister slept on a couch, and her other half-brother slept in a crib, all located in the living room. The family's clothes were kept in the basement, except for N.F.'s half-brothers' clothes which were kept in their mother's room.

When the four oldest children lived with their mother, she worked 32 hours a week at a nursing home and left for work around 4:30 or 4:50 a.m. The children would set alarms on their phones to wake them up for school in the morning. Chavez, who is self-employed, working in the summers between June and October, would be home with the children in the morning after their mother had gone to work.

N.F. testified that Chavez began touching her "privates," by which she meant her "butt and vagina," when she was in fifth grade and they were living in the brown house. The touching occurred on more than one occasion and also happened when N.F. was in the sixth grade. Shortly after the family moved into the brown house, Chavez made some repairs to the home. N.F. testified that Chavez first touched her in his bedroom after these repairs had been completed, although her mother testified that the repair work was on-going with the "bulk of the upstairs stuff" having been completed only a month or two prior to trial. N.F. recalled that prior to the first touching incident,

she was in Chavez' room changing her half-brothers' diapers. Chavez was in the room, and when N.F. had finished and was leaving the room, Chavez came up to her and started touching her. Chavez picked N.F. up and sat her on the bed. He touched N.F.'s buttocks and vaginal area on top of her clothes and also "got on top of" her. She told him to get off of her and stop, and he did so. Chavez did not say anything during or after the incident. N.F. did not tell her mother about it because she was scared. N.F. testified that there were other touching incidents in the bedroom.

N.F. described another touching incident that occurred in the fifth grade when she was in the basement. According to N.F., Chavez followed her down the stairs, picked her up "[l]ike a baby," sat her on his lap, and touched her "butt and vagina." N.F. could feel that Chavez' penis was hard when she was sitting on his lap. Chavez did not say anything to N.F. during the incident, and she did not say anything to him. Chavez never carried her like a baby in front of her mother but carried her like that in the basement on more than one occasion.

N.F. also described inappropriate touching that occurred in the living room. When N.F. was sitting on the couch watching television with her full siblings, Chavez covered the two of them with a blanket and touched her vaginal area on top of her clothes. N.F. testified that her full brothers saw Chavez touching her. Neither Chavez nor N.F. said anything during this incident. According to N.F., Chavez would occasionally come into the living room when she was sleeping on the floor and lay down by her. Her oldest half-brother would sometimes sleep on the floor next to her, and Chavez would lay beside N.F. until her half-brother was asleep. Then Chavez would hug her and touch her vaginal area on top of her clothes. Neither of them spoke on these occasions.

At some point while the family lived in the brown house, Chavez started touching N.F. under her clothes. The first incident occurred in the morning after N.F.'s mother had gone to work and before N.F. left for school at 7:50 a.m. Chavez was beside N.F. when she was changing one of her half-brother's diapers. When she had finished, Chavez laid her down on the bed, unzipped her pants, and put his hand under her underwear. N.F. testified that Chavez laid on top of her, touched and rubbed her vaginal area, and inserted his finger a "little bit" into her vagina. Chavez had his clothes on. N.F. testified that Chavez' penis was on her "bad spot" and that it "felt hard." Chavez did not say anything during the incident. N.F. told him to get off her, and he did. N.F. went to school that day. She did not tell anyone what Chavez had done that morning because she "didn't want to."

N.F. testified that there were occasions when Chavez would "just lay on top of" her and move "up and down." Chavez also touched N.F. under her clothes on more than one occasion. He only touched her under her clothes with his hands. The last time he did so was in January 2015 just prior to N.F.'s 12th birthday. On that occasion, Chavez was laying on his bed when N.F. went into his room to get money for breakfast at school. Chavez told her to "come over," and he hugged her and pulled her on top of him on the bed when she approached. N.F. was still wearing her pajamas at the time. Chavez rubbed her vaginal area with his hand under her clothes. N.F. could feel that Chavez' penis was hard. Chavez did not say anything to her during this incident.

Shortly after this incident, N.F. told her father about the touching because she was tired of it. N.F. told her father that she did not want to go back to her mother's house because Chavez had touched her. She returned to her mother's house, and that Wednesday she called her father to ask what he was going to do, if anything. N.F. began living full time with her father that Friday. N.F.

never told her mother about the touching because she was scared. N.F. testified that her full brothers were aware the touching was occurring, but she did not know if they ever told their mother about it.

After reporting the touching, N.F. was interviewed by "Misty" on two occasions. N.F. testified that she did not tell Misty everything the first time because she was scared and did not know what to say. N.F. stated that she told Misty "everything that happened" during the second interview.

On cross-examination, N.F. testified that things were "fine" when Chavez first began living with her mother but got worse as time went on. She had wanted to move back with her father for quite a while, but she denied ever having discussions with him about moving back "before this happened." One of the reasons she wanted to live with her father was because the rules were less strict at his house. According to N.F., Chavez sometimes wrestled around with her and her siblings in a playful manner, but she denied ever hanging from Chavez like a monkey or rolling around on the floor with him. N.F. affirmed that Chavez did not say anything to her during the incidents she described on direct examination. She stated that the second interview with Misty was initiated after she told her father she had "a little bit more to say." N.F. testified that she did review the video of her interview with Misty prior to testifying and that she did not talk to anyone about the interview before trial. She did review "what [she] initially reported" with "Sandy."

On redirect, N.F. testified that Chavez still lives with her mother and that she does not visit her mother because she does not want to do so. She denied making up the allegations of abuse simply because she and her brothers did not like the rules at Chavez' and her mother's house so that they could live with her father.

The State called both of N.F.'s full brothers as witnesses. After questioning N.F.'s oldest full brother about the meaning and importance of telling the truth, the district court found that he was not competent to testify. N.F.'s 10-year-old brother was found competent to testify. He remembered moving out of the brown house to live with his father "[b]ecause something bad happened" to N.F. there. He knew something bad happened because he "was watching them" and "saw stuff" a couple of times. He described the family's sleeping arrangements and testified that Chavez and N.F. would be "really close to each other" when they were asleep on the floor in the living room. N.F.'s brother recalled watching television early in the morning after his mother had left for work and testified that he saw Chavez and N.F. on the floor under a blanket. N.F.'s brother also saw Chavez and N.F. on the couch covered by a blanket. He observed Chavez' hands "moving around [N.F.'s] body parts," and he made eye contact with N.F. during the incident. N.F.'s brother testified that he observed Chavez with N.F. on either the couch or the floor on four occasions in one week. He did not say anything to Chavez or his mother because he thought he would get in trouble. He and N.F. told their father that Chavez "was doing something to [N.F.]" shortly after this incident and shortly before they began living with him. He denied "mak[ing] up a story" together with N.F. and their older brother so that they could live with their father. He testified that they never even spoke with one another about living with their father.

N.F.'s father confirmed that N.F.'s aunt contacted law enforcement in January 2015 after they discussed "the things that were going on because of what [Chavez] was doing to [N.F.]." N.F.'s father testified that he learned "what was going on" on a Sunday when his children did not

want to return to their mother's house after visitation. N.F.'s father did not contact the children's mother at that time because he had been injured in a work accident and had taken some medication. N.F.'s father testified that he was concerned about what the children told him but that he did not call their mother right away because he did not want to "get angry" or "make the situation any bigger." Later that week, N.F. called him and asked whether he was going to "do something," which prompted him to discuss the matter with N.F.'s aunt. N.F.'s father stated that when N.F. called him, she was "[n]ervous, sad, like crying."

N.F.'s aunt testified that she called law enforcement on January 29, 2015 after her brother called and explained that "[N.F.] said something to [him] on Sunday when [he] took [the children] back." Police came to the residence of N.F.'s father where he reported that there was some inappropriate touching occurring between Chavez and N.F. At some point, N.F.'s father and aunt took the four children to the Child Advocacy Center for interviews. N.F.'s aunt testified that after the interview, N.F. told her that Chavez had touched her "under the underwear" and that she had not "mention[ed] that in the interview." After N.F. provided this information, N.F.'s aunt called law enforcement a second time.

Tracey Landenberger, police chief for Sutton, Nebraska, became involved in this case on January 29, 2015 after N.F.'s aunt reported the inappropriate touching by Chavez. He met with N.F.'s father and aunt and then set up an interview for N.F. and her full siblings the next day at the Child Advocacy Center. Landenberger observed the interviews and noted that N.F. seemed "[v]ery shy," "kind of scared," and "[j]ust nervous speaking" during her interview. After the interviews, Landenberger went to Chavez' residence where he made contact with Chavez and N.F.'s mother. Chavez was then arrested and taken to jail. Later that day, Landenberger spoke with Chavez after advising him of his *Miranda* rights. When Landenberger questioned Chavez about the allegations, Chavez only admitted "an incident where he had grabbed [N.F.] and picked her up in the basement." Chavez did not offer any particular reason as to why N.F. might be "saying these things" about him.

Landenberger was aware that N.F. was interviewed a second time at the Child Advocacy Center. Landenberger set up the second interview after N.F.'s aunt called and reported overhearing N.F. speak about "things that she didn't tell the interviewer that she thought she should." Landenberger observed the second interview and testified that N.F. was "kind of sobbing and really kind of quiet and shy at times" during it.

Landenberger testified that he had been involved in 8 to 10 sexual assault investigations since becoming a law enforcement officer. When Landenberger was asked, "And in your experience in those eight to 10 cases, do victims of sexual abuse always disclose all of the details the first time they tell their story," Chavez objected that Landenberger was not qualified as an expert. The State clarified that it was not trying to qualify Landenberger as an expert but that it was asking about Landenberger's experience based on the cases in which he had been involved. The district court stated, "I am only receiving [Landenberger's opinion] for his experience only, eight to 10 cases, so it's not an expert opinion. It's only his opinion. I will give it whatever weight I think it needs or deserves." Landenberger then testified that "it's not uncommon for them not to tell everything."

Prior to resting, the prosecutor made an oral motion to amend the information to conform to the evidence at trial. The prosecutor explained that the current information listed dates between August 1, 2014 and January 30, 2015, which was "a typographical error due to the fact that in the reports and the CAC interview, [N.F.] had stated that this began when she was in the fifth grade, and the records indicate that she was in the fifth grade [starting] in August of 2013." The prosecutor also referenced evidence showing that the family moved into the brown house where the alleged incidents occurred in 2013 and sought to amend the information to show that the crimes occurred between August 1, 2013 and January 30, 2015. Chavez did not object, and the district court granted the motion.

After the State rested, Chavez made a motion to dismiss "at least Count I, the attempted first degree," arguing that, although there was testimony that "something happened under the clothes," it was "at most[,] sexual contact." The district court denied Chavez' motion to dismiss as to all the counts in the information.

Chavez presented testimony from N.F.'s mother. She described her relationship with N.F. as "[o]kay" and N.F.'s relationship with Chavez as "[p]retty good." She did not recall any time when Chavez and N.F. were in the basement together and testified that everyone had separate blankets when sleeping in the living room. N.F.'s mother had observed N.F. enter Chavez' bedroom when he was playing with his boys and ask to be thrown on the bed in the same way he was playfully throwing the boys onto the bed. She also testified that Chavez "wrestle[d] around" with N.F. and her sister. N.F.'s mother testified that she had never seen Chavez do anything inappropriate to N.F. N.F. never indicated to her mother that Chavez was mean, yelled at her, or spanked her, and she had never seen N.F. get angry at Chavez. N.F.'s mother testified that her oldest four children never seemed reluctant to visit their father. To the extent it seemed "like they didn't want to be home" when they returned, she felt it was not due to a reluctance to return but "more like they didn't want discipline." She had not observed any behavioral changes in N.F. in the last few months before the abuse was reported.

After being advised of his rights, Chavez chose to testify. He testified to helping the older children get ready for school in the mornings and stated that N.F. seemed to enjoy being around him. According to Chavez, N.F. would sometimes sit on his lap when he was watching television or working on the computer, and this was an activity that continued throughout the time the children lived with their mother. Chavez testified that he hugged, wrestled and played with N.F. and all the children.

Chavez denied laying on the floor with N.F. although he testified that he would lay on the floor with his son and N.F. "would be there on the side." He denied being under the same blanket with N.F. Chavez testified that when he sat on the couch watching television, N.F. would sit with him. According to Chavez, he would tell her to go away so he could relax, but she was "pretty insistent." Chavez denied ever touching N.F.'s private parts, either over or under her clothing, or picking her up like a baby. Chavez admitted that he did carry her because when he went down to the basement, N.F. would be waiting for him and would "jump on [him] and then hang on [him] like a monkey." Chavez denied laying on top of N.F., putting his hand down her pants, or rubbing against her body in any way.

- 6 -

Chavez testified that he noticed a "radical" change in the older children's behavior in the last few months before they began living with their father. Chavez thought this change might have been due to the children not liking the discipline in the home, which "could have been a little bit strict." Chavez thought that N.F. might be accusing him of the sexual abuse because she did not like the level of discipline at the house, although Chavez testified that he only ever used "timeouts" for discipline. Chavez denied that one of the "radical changes" he saw in N.F. was that she started wetting the bed. He also denied telling N.F. that if she told anyone what he was doing to her, he would tell her friends that she was wetting the bed or peeing her pants.

The State recalled N.F. as a rebuttal witness. N.F. testified that shortly after the touching started, she began having bed wetting issues, which were ongoing. She also testified that Chavez threatened to tell her friends about the bed wetting if she told anyone what he had done to her. On cross-examination, she testified that he told her this while he was doing something to her. She acknowledged having stated in her earlier testimony that Chavez never said anything to her during the incidents of abuse, and she remained silent when asked about this inconsistent testimony. She denied being reminded "to say this" by anyone.

On redirect, N.F. testified that she had told Misty about the bed wetting and Chavez' threats during one of her interviews at the Child Advocacy Center. She testified that Chavez only threatened to tell her friends about the bed wetting on one occasion.

### 3. VERDICT

The district court found Chavez not guilty of attempted first degree sexual assault of a child, but it found him guilty of all three counts of third degree sexual assault of a child. The court ordered a presentence investigation and scheduled a sentencing hearing.

### 4. SENTENCING

The district court sentenced Chavez to consecutive terms of 3 to 5 years on each count of third degree sexual assault of a child, gave him credit for 101 days' time served, and ordered him to pay court costs.

Chavez subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Chavez asserts, reordered, that the district court erred in (1) overruling his objection to the admission of Landenberger's testimony, (2) finding sufficient evidence to support his convictions, and (3) imposing excessive sentences. He also asserts that his trial counsel provided ineffective assistance in several ways.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016). A judicial abuse of

- 7 -

discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Edwards*, 294 Neb. 1, 880 N.W.2d 642 (2016).

An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014). In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016). The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and was the defendant prejudiced by counsel's alleged deficient performance? *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits unless the trial court abused its discretion. *State v. Wilkinson*, 293 Neb. 876, 881 N.W.2d 850 (2016).

## V. ANALYSIS

### 1. ADMISSION OF NONEXPERT TESTIMONY

Chavez asserts that the district court erred in overruling his objection to the admission of Landenberger's testimony. Landenberger testified that he had been involved in approximately 8 to 10 sexual assault investigations. When Landenberger was asked whether "in [his] experience in those eight to 10 cases," victims of sexual abuse "always disclose all of the details the first time they tell their story," Chavez objected that Landenberger was not qualified as an expert. When the State clarified that it was only inquiring about Landenberger's experience based on the cases he had been involved in, the court allowed the testimony. Landenberger then testified that it was not uncommon for victims "to not tell everything."

Neb. Rev. Stat. § 27-701 (Reissue 2008) provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In contrast, Neb. Rev. Stat. § 27-702 (Reissue 2008) provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Chavez argues that Landenberger was providing scientific or technical knowledge with respect to "normal child disclosures in sexual assault cases and how piecemeal disclosures are not uncommon," which goes beyond a lay opinion and should be considered expert testimony. Brief for appellant at 18. The Nebraska Supreme Court has addressed the admissibility of expert testimony in child sexual assault cases. In *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992), the Court approved the admission of expert testimony from a doctor concerning the symptoms, behavior, and feelings generally exhibited by children who have been sexually abused. The Court reasoned that "'few jurors have sufficient familiarity with child sexual abuse to understand dynamics of sexually abusive relationship,'" and "'the behavior exhibited by sexually abused children is often contrary to what most adults would expect.'" *Id.* at 30, 486 N.W.2d at 204, quoting *People v. Nelson*, 203 Ill. App. 3d 1038, 149 Ill. Dec. 161, 561 N.E.2d 439 (1990). In *State v. Doan*, 1 Neb. App. 484, 489, 498 N.W.2d 804, 808 (1993), this court found no abuse of discretion in the trial court's determination that a counselor was qualified to testify as an expert in a case involving child sexual assault despite noting that her qualifications were "quite limited." However, we went on to find reversible error in the admission of the counselor's testimony, finding that "an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated." 1 Neb. App. at 496.

In this case, we are called to determine whether a police officer's testimony in a child sexual assault case was properly admitted as lay or expert testimony. The Nebraska Supreme Court has addressed the admissibility of police officer testimony in various instances, although not in relation to a victim's disclosures in a sexual assault case.

In *State v. Howard*, 253 Neb. 523, 571 N.W.2d 308 (1997), the Nebraska Supreme Court was faced with the question of whether an officer's testimony that the defendant was intoxicated should be examined under § 27-701 governing lay opinion testimony or § 27-702 governing expert opinion testimony. The Court noted its previous holding that "after sufficient foundation is laid, a law enforcement officer may testify that in his or her opinion the defendant was driving while intoxicated." *Id.* at 530, 571 N.W.2d at 315, quoting *State v. Dail*, 228 Neb. 653, 424 N.W.2d 99 (1988). The Court in *Howard* determined, without expressly stating whether the officer testimony was considered lay or expert, that the officer's testimony was admissible because it was based on his training, his being involved in the prior arrest of 150 to 200 intoxicated drivers, and his personal observations of the defendant.

In *State v. Campbell*, 260 Neb. 1021, 620 N.W.2d 750 (2001), the Supreme Court concluded that a police officer could testify to his opinion as an expert that a substance was marijuana. The Court stated that a "person may qualify as an expert by virtue of either formal training or actual practical experience in the field." 260 Neb. at 1028.

The Nebraska Supreme Court has recently upheld the admission of police officers' testimony based on their own observations and experience. In *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016), the Court determined that an officer could testify about certain aspects of a photograph album that were pertinent to the case; namely the officer's observation of a blank page and the effect on contact sheets after they have been lifted. The defendant argued that the officer should not have been allowed to give opinion testimony because the State did not establish that

she was an expert on contact sheets. The Court found that the officer's testimony was proper lay witness testimony under rule 701. In reaching this conclusion, the Court noted that the officer was not actually permitted to testify that she believed photographs had been removed from the photo album.

In *State v. Russell*, 292 Neb. 501, 874 N.W.2d 8 (2016), a police officer was allowed to testify regarding the meaning of drug-related code words and slang used in calls that were intercepted from the defendant's cell phone. On appeal, the defendant argued that the officer's testimony was inadmissible as either lay or expert testimony. Because the defendant's only objection at trial was that the officer's testimony invaded the province of the jury, the Court analyzed only whether the officer's testimony was properly received as a lay opinion. In concluding that the testimony was properly admitted, the Court looked to federal cases which apply similar rules of evidence concerning lay and expert opinions. The Court found that "[t]hese courts have determined that such opinion testimony in lay and expert form is admissible provided that foundational or procedural requirements are met. 292 Neb. at 508.

In this case, Landenberger was not asked to testify about the dynamics of a sexually abusive relationship or the behavior exhibited by sexually abused children. He was not asked to give an opinion regarding the veracity of the victim's statements. Rather, he was asked a question based on his own experiences with respect to the disclosures made by the victims in the 8 to 10 cases of sexual assault that he had investigated. Although Landenberger's experience in this regard was quite limited, there was nevertheless sufficient foundation for him to testify about his observations of disclosures made by victims in the cases that he investigated. We conclude that the district court did not abuse its discretion in admitting this testimony as a lay opinion.

We recognize, however, that Landenberger's response to the question posed could be perceived as not being limited to his experience. Landenberger was asked, "And in your experience in these 8-10 cases, do witnesses of sexual abuse always disclose all of the details the first time they tell their story?" Landenberger replied, "[i]t's not uncommon for them not to tell everything." Even if Landenberger's response went beyond that of a lay witness and was admitted in error, we conclude that it was harmless error. In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error. *State v. Rask*, 294 Neb. 612, 883 N.W.2d 688 (2016). Trial in this case was to the district court, which noted that it would give Landenberger's testimony about his experience with disclosures by victims of sexual abuse the weight it deserved. Given the court's acquittal of Chavez on the charge of attempted first degree sexual assault of a child (which corresponded to the second disclosure by N.F. that touching occurred under the clothing), the court apparently did not give Landenberger's testimony regarding piecemeal disclosures much weight. And, as discussed below, the evidence was sufficient to support Chavez' conviction of three counts of third degree sexual assault of a child, charges that did not rely on N.F.'s disclosure of touching under the clothing. Accordingly, we conclude that any error in admitting Landenberger's testimony regarding piecemeal disclosures would be harmless error.

## 2. SUFFICIENCY OF EVIDENCE

Chavez asserts that the district court erred in finding sufficient evidence to support his convictions.

Chavez first notes that the information alleged three counts of third degree sexual assault of a child, but it referenced § 28-319.01 (first degree sexual assault of a child) rather than § 28-320.01 (second and third degree sexual assault of a child).

A defect in the manner of charging an offense is waived if, upon being arraigned, the defendant pleads not guilty and proceeds to trial, provided the information or complaint contains no jurisdictional defect and is sufficient to charge an offense under the law. *State v. Wilkinson*, 293 Neb. 876, 881 N.W.2d 850 (2016). The function of an information is twofold: With reasonable certainty, an information must inform the accused of the crime charged so that the accused may prepare a defense to the prosecution and, if convicted, be able to plead the judgment of conviction on such charge as a bar to a later prosecution for the same offense. *Id.* Where an information alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition, the charge is normally sufficient. *Id.* However, when the charging of a crime in the language of the statute leaves the information insufficient to reasonably inform the defendant as to the nature of the crime charged, additional averments must be included to meet the requirements of due process. *Id.*

With respect to the second, third, and fourth counts of the information, the State alleged that Chavez subjected N.F., a person 14 years of age or younger at the time of the act, to sexual contact while Chavez was 19 years of age or older in various locations. The caption of the information, while referencing the incorrect statute in connection with Counts II-IV, charged Chavez with "Sexual Assault of a Child 3rd Degree." Section 28-320.01 provides that a person commits third degree sexual assault of a child if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older and the actor does not cause serious personal injury to the victim. The information alleged the commission of three counts of third degree sexual assault of a child using language of the statute defining that crime and was reasonably sufficient to inform Chavez as to the nature of the crime charged. When Chavez pled not guilty and proceeded to trial, he waived any defect in the information.

With respect to the sufficiency of the evidence, Chavez essentially urges us to reweigh the evidence and pass on the credibility of witnesses, something an appellate court does not do as those are matters are for the finder of fact. See *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016). When viewed in the light most favorable to the State, the evidence was sufficient to support Chavez' convictions for third degree sexual assault of a child. The evidence showed that when Chavez was older than 19 and N.F. was younger than 14, he subjected her to sexual contact in three separate locations in the brown house. Sexual contact is defined as:

[T]he intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact

shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01

The evidence showed that Chavez touched and rubbed N.F.'s intimate parts over her clothing in the living room, his bedroom, and the basement of the brown house. She could feel that his penis was hard. In short, the evidence at trial could have led a rational trier of fact to find the essential elements of the crime of third degree sexual assault of a child beyond a reasonable doubt. This assignment of error is without merit.

### 3. EXCESSIVE SENTENCE

Chavez asserts that the district court erred in imposing excessive sentences. He argues that both the length and consecutive nature of the sentences was excessive.

Chavez was convicted of three counts of third degree sexual assault of a child, all Class IIIA felonies. § 28-320.01; Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). The district court sentenced Chavez to incarceration for consecutive periods of 3 to 5 years with credit for 101 days served. Class IIIA felonies are punishable by a maximum of 5 years' imprisonment, or a $10,000 fine, or both, with no minimum term of imprisonment. § 28-105. The sentences imposed by the district court were clearly within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, an appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Wilkinson*, 293 Neb. 876, 881 N.W.2d 850 (2016). The sentencing court is not limited to any mathematically applied set of factors. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015).

At the sentencing hearing, the district court stated that it had considered the nature and circumstances of the offenses; Chavez' age, mentality, education, experience, and social and cultural background; his limited criminal history; and the testing by and recommendation of probation. Chavez' criminal history only shows a traffic offense in Nebraska though he also reported to the probation officer who conducted the presentence investigation that he had prior traffic tickets in Florida and Illinois. On the level of service/case management inventory, Chavez scored at the medium high risk to reoffend although he scored as a low risk on the Vermont

Assessment for Sex Offender Risk evaluation. In sentencing Chavez, the court also noted that Chavez was married, had two children, and continued to deny abusing N.F., his stepdaughter. The court noted that it had observed N.F. testify and that "[i]t was obviously a traumatic event for her." The sentences imposed were within the statutory limits and were not excessive either by virtue of their length or due to being imposed consecutively. The court did abuse its discretion in sentencing Chavez.

4. INEFFECTIVE ASSISTANCE OF COUNSEL

Chavez asserts that his trial counsel provided ineffective assistance in several ways. We address each of his arguments in turn.

(a) Relevant Law

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016). Otherwise, the issue will be procedurally barred. *Id.* In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction action, appellate counsel must present the claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014). An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *State v. Abejide*, 293 Neb. 687, 879 N.W.2d 684 (2016).

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Parnell, supra*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.* When an ineffective assistance of counsel claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id.* An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id.*

(b) State's Motion to Appoint Representative

Chavez asserts that his trial counsel was ineffective in failing to object to the State's motion to appoint a representative. At the start of trial, the parties made reciprocal requests for sequestration of witnesses, which were granted by the district court. However, the State made an

oral motion pursuant to Neb. Rev. Stat. § 27-615 (Reissue 2008) to declare Landenberger the State's representative and to allow him to remain in the courtroom during trial. Chavez' counsel did not object and the court granted the State's motion.

Chavez acknowledges § 27-615 and case law allowing the State to appoint a representative to remain in the courtroom after a sequestration order. See *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004) (finding no error in trial court's decision granting State's motion designating deputy sheriff as its representative for trial); *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989) (affirming trial court's decision to allow expert witness doctor designated as State's representative to remain in courtroom throughout trial despite sequestration order). See, also, *United States v. Jones*, 687 F.2d 1265 (8th Cir. 1982) (holding it permissible for law enforcement officer to be present during trial even where sequestration order entered); *United States v. Shearer*, 606 F.2d 819 (8th Cir. 1979); *United States v. Woody*, 588 F.2d 1212 (8th Cir. 1978), cert. denied 440 U.S. 928, 99 S. Ct. 1263, 59 L. Ed. 2d 484 (1979).

In this case, the district court did not err when it allowed Landenberger to remain in the courtroom during trial. Accordingly, Chavez' trial counsel was not ineffective for failing to object to the State's motion.

(c) Failure to Object to Hearsay

Chavez argues that his trial counsel was ineffective for not objecting to hearsay testimony which led to cumulative evidence. Specifically, he notes testimony from N.F.'s father and aunt about the allegations made by the children. He also notes Landenberger's testimony that he took a verbal statement from N.F.'s father and aunt that "they were concerned [about] inappropriate touching." Chavez argues that his trial counsel should have objected to these "examples of hearsay" and that by allowing in statements regarding the allegations from other witnesses, this testimony became cumulative. Brief for appellant at 22.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801(3) (Reissue 2008). While some of the testimony noted by Chavez did not include actual hearsay statements, some of it did. Objections to this testimony arguably would have been sustained if there were no applicable hearsay exceptions, and neither party suggests any such exceptions to the testimony noted by Chavez.

However, as acknowledged by Chavez, this testimony was cumulative in that it reiterated testimony by N.F. about how and what she reported to other adults with respect to the inappropriate touching. Even if Chavez' counsel should have objected to the noted testimony as hearsay, generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016).

Chavez argues that the cumulative testimony bolstered N.F.'s inconsistent testimony, thus prejudicing him. In connection with this assigned error, Chavez again attacks N.F.'s credibility. However, as we have previously stated, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Jenkins, supra*. A trial judge is presumed in a jury-waived criminal trial to be familiar with and

apply the proper rules of law, unless it clearly appears otherwise. *State v. Tucker*, 278 Neb. 935, 774 N.W.2d 753 (2009). In a case tried to a court without a jury, there is a presumption that the trial court, in reaching its decision, considered only evidence that is competent and relevant. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005). In the absence of evidence to the contrary, the presumption is that a judge will disregard evidence that should not have been admitted. *Id.* We conclude that because there was no harm in the admission of the cumulative testimony, trial counsel could not have been ineffective in failing to object.

To the extent Chavez generally complains of his trial counsel's failure to object to testimony as hearsay other than the testimony noted above, it is not the function of an appellate court to scour the record looking for unidentified evidentiary errors. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005).

Chavez' arguments about hearsay are without merit.

(d) Amended Information

Chavez argues that his trial counsel was ineffective for failing to object to the amended information. The district court granted the State's request to amend the information to conform to the evidence at trial due to a typographical error with respect to the date range of the offenses alleged. The information was amended to state that the sexual contact occurred between August 2013 and January 2015, rather than between August 2014 and January 2015. Chavez argues that because N.F. was unable to provide specific dates, he was required to "defend himself against a moving target" and that by failing to object, his counsel failed to "address a significant weakness in the State's case." Brief for appellant at 24.

Neb. Ct. R. § 6-1115(b) allows for amendment of pleadings to conform to the evidence at trial. The amendment to the information in this case conformed the information to the proof at trial which showed that Chavez' sexual contact with N.F. occurred while she was in fifth and sixth grade and they were living in the brown house. The evidence showed that they moved into the brown house in 2013 and that N.F. began fifth grade in 2013. She was unable to provide specific dates for the assaults, but she testified to various instances of sexual contact occurring in this date range and in the three locations of the house as alleged in the information. The exact time when a criminal offense is committed is not an essential element of a crime unless the statute defining the offense makes a date or time an indispensable element of the crime charged. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). Other than defining the respective ages of the perpetrator and the victim, § 28-320.01 does not make a date or time an indispensable element of the crime charged. Chavez and N.F.'s ages at the time of the acts of sexual contact were alleged in the original information. The original information advised Chavez that he needed to defend himself against allegations that he subjected N.F., a person 14 years of age or younger at the time of the act, to sexual contact while Chavez was 19 years of age or older in the living room, Chavez' bedroom, and in the basement. The amendment to the information did not alter these essential elements of the crimes alleged.

Chavez' argument is without merit.

## (e) Aggregate Error

Chavez also argues that his trial counsel provided ineffective assistance, which when viewed in the aggregate, made the process fundamentally unfair for him. See *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015) (while any one of several errors may not, in and of itself, warrant reversal, if all of errors in aggregate establish that defendant did not receive fair trial, new trial must be granted). Because we have determined that Chavez' assertions of ineffective assistance are without merit, this argument fails as well.

## VI. CONCLUSION

The district court did not err in overruling Chavez' objection to the admission of Landenberger's testimony or in finding sufficient evidence to support his convictions. The court did not impose excessive sentences. Chavez' claims of ineffective assistance of trial counsel are without merit.

AFFIRMED.