Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/19/2016 09:08 AM CDT

State of Nebraska, appellee, v.
Erica A. Jenkins, appellant.
___ N.W.2d ___

Filed August 19, 2016.    No. S-15-169.

1. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), and the trial court's decision will not be reversed absent an abuse of discretion.
2. **Trial: Photographs: Appeal and Error.** An appellate court reviews a trial court's admission of photographs of a victim's body for abuse of discretion.
3. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.
4. **Rules of Evidence: Other Acts.** The purpose of Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), is that evidence of other acts, despite its relevance, creates the risk of a decision by the trier of fact on an improper basis.
5. **Rules of Evidence: Other Acts: Proof.** Under Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Cum. Supp. 2014), before a court can admit evidence of an extrinsic act in a criminal case, the State must prove by clear and convincing evidence, outside the presence of the jury, that the defendant committed the extrinsic act.
6. **Rules of Evidence: Other Acts.** Direct evidence of a charged crime is not an extrinsic act that is subject to exclusion under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014).
7. **Verdicts: Juries: Appeal and Error.** In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather,

whether the guilty verdict rendered in the trial was surely unattributable to the error.

8. **Trial: Evidence: Appeal and Error.** Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

9. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

10. **Homicide: Photographs.** If a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if gruesome.

11. ____: ____. In a homicide prosecution, a court may receive photographs of a victim into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.

12. **Constitutional Law: Witnesses.** The Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him or her. The main and essential purpose of confrontation is to secure the opportunity for cross-examination.

13. **Evidence: Appeal and Error.** The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

14. ____: ____. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Beau G. Finley, of Finley & Kahler Law Firm, P.C., L.L.O., and Sean M. Conway, of Dornan, Lustgarten & Troia, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, Stacy, and Kelch, JJ.

HEAVICAN, C.J.

## I. NATURE OF CASE

Erica A. Jenkins directly appeals from her convictions for murder in the first degree, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. A jury found that Jenkins killed Curtis Bradford on or about August 19, 2013. Jenkins challenges several evidentiary rulings by the district court and also asserts there was insufficient evidence to support her convictions. We affirm.

## II. BACKGROUND

### 1. CRIME SCENE

On the morning of August 19, 2013, a body, later identified as Bradford, was discovered outdoors near a garage in the vicinity of 18th and Clark Streets in Omaha, Nebraska. Although no one called emergency services until approximately 7 a.m. on August 19, residents later reported hearing gunshots the night of August 18. Some of these residents reported they heard the gunshots as early as 10:30 p.m., some as late as midnight.

At the scene on August 19, 2013, investigators observed Bradford's body slumped over, face down. Bradford was wearing sneakers, black pants, a pair of gloves, and a black hoodie with the hood over his head. There were holes in the back of Bradford's hood, surrounded by apparent gunshot residue. Investigators turned over Bradford's body and observed massive head trauma. A shotgun slug was found in an area of loose ground a couple inches from where Bradford's head had been. An autopsy later revealed a second, smaller caliber bullet in Bradford's brain.

### 2. EVENTS LEADING UP TO AND INCLUDING AUGUST 18 AND 19

At trial, Bradford's mother testified that Bradford either had friends in or had been personally affiliated with a gang known as Camden Block. Several witnesses connected Jenkins'

brother, Nikko Jenkins, with the same gang. In addition, a person known as P-Dough was a member of the gang. Two witnesses—Melonie Jenkins and Lori "Lolo" Sayles (Lolo), sisters of Jenkins and Nikko—identified Bradford as a "duck" or puppet of P-Dough's, meaning that Bradford would do what P-Dough told him to do. Lolo and Melonie each testified to conversations with Jenkins in which Jenkins told them she believed P-Dough was responsible for a shooting at Jenkins' home in February 2013. The State's theory of motive at trial was that Jenkins sought retaliation for that shooting by killing P-Dough's puppet—Bradford.

Lolo testified at trial that on the evening of August 18, 2013, she and Jenkins were at a house belonging to their mother, Lori Jenkins. At some point, Nikko came to the house with Bradford, whom Lolo had not previously met. Nikko and Bradford were wearing black clothes. After Lolo let Nikko and Bradford into the house, she saw them in the kitchen looking at an assault rifle. Shortly thereafter, Lori came home. To hide the rifle from Lori, Bradford wrapped it in a jacket and placed it behind the couch. According to Melonie's testimony at trial, Jenkins later told her that while at Lori's house, Jenkins had a conversation with Nikko about planning to kill Bradford.

Lolo testified at trial that soon after Lori came home, around 11:30 p.m. to midnight, Lolo, Nikko, and Bradford left the house and Jenkins chased after them. Bradford was carrying the rifle, still wrapped in the jacket, when they left. At trial, Lolo said she was not sure where they were going at the time. They got into a car belonging to Nikko's girlfriend. Nikko drove, with Bradford in the front passenger seat and Lolo and Jenkins in the back seat.

Nikko drove the car toward an area referred to as "16th Street" or "the bottoms," which was known to several witnesses at trial as a rival gang neighborhood. According to Lolo's testimony at trial, Nikko told them all to turn off their cell phones as they approached the bottoms. During the

drive, Nikko and Bradford allegedly discussed performing a robbery.

Nikko backed the car into a driveway area on the north side of Clark Street, between Florence Boulevard and 18th Street, near a group of townhome-style residences. Jenkins, Nikko, and Bradford then exited the car, and Nikko told Lolo to get into the driver's seat. Nikko was carrying a sawed-off shotgun, and Bradford was carrying the rifle. Lolo testified that she did not see Jenkins with a gun that night.

Lolo testified that about 30 to 45 seconds after the others left the car, she heard a gunshot. About 15 seconds after the first, she heard a second, louder, "boom" and saw a flash in the car's rearview mirror.

Lolo got out of the car and then saw Jenkins and Nikko come running back. Nikko was carrying the shotgun. In an interview with police, Lolo initially stated that Nikko was also carrying the rifle at this time. But when pressed further during that interview, and then again at trial, Lolo admitted that she was trying to protect Jenkins and that Jenkins was actually carrying the rifle.

Lolo testified that Nikko told her to drive the car but that she refused, so Nikko drove the car. They drove to a house belonging to Brian Easterling, a cousin of Jenkins and her siblings. Nikko had been staying at Easterling's house after being released from incarceration in late July 2013. Lolo testified at trial that Nikko went downstairs, where Easterling was watching a movie with a friend.

During his testimony at trial, Easterling corroborated the fact that at approximately 1 a.m. on August 19, 2013, Jenkins and Nikko both came into his home. Easterling testified that he never saw Lolo that night, but that she could have been upstairs. He further testified that while Jenkins and Nikko were downstairs, they washed blood and brain matter off of an assault rifle. He identified the rifle as the same one Lolo identified as the weapon Bradford carried that night. Easterling also testified that Jenkins removed a revolver from

her purse. Easterling said that Nikko and Jenkins seemed excited and that Jenkins was upset with Nikko. Jenkins expressed disappointment because she had shot Bradford first and then Nikko shot Bradford. At trial, Melonie testified to a similar exchange.

According to Melonie's testimony at trial, Jenkins later gave Melonie an account of the events of August 18 and 19, 2013, very similar to the facts above. According to Melonie, Jenkins said that when she, Nikko, and Bradford got out of the car that night, they were walking along the garage single file. Jenkins then shot Bradford in the back of the head with her revolver, and after Bradford fell, Nikko shot Bradford in the head with the shotgun.

### 3. EVIDENCE CONCERNING JENKINS' REVOLVER AND ARGUMENT WITH LORI

At trial, the State also introduced evidence of other incidents in which Jenkins allegedly wielded a revolver. First, Lolo testified that in February 2013, she had seen Jenkins with a revolver. Second, Melonie testified that sometime after Bradford's death, she had gone over to Lori's house and Jenkins opened the door with a black revolver in her hand. Third, Melonie said she had also seen Jenkins with the same gun in June 2013.

Fourth, both Lolo and Melonie testified at trial that sometime after Bradford's death, Jenkins was at Lori's home with a number of other family members present when she got into a heated argument with Lori. According to Lolo, Jenkins and Lori fought about a niece of Jenkins' ripping the leaf off a plant. As the argument escalated, Nikko took Jenkins into another room and Lolo heard Jenkins yelling, "I'll pop that bitch like I popped that nigga." According to witnesses at trial, to "pop" somebody means to shoot them. Nikko then exited the room, carrying the revolver. Lolo testified that Jenkins did not say whom she had shot or when.

Melonie, on the other hand, testified that Jenkins and Lori fought specifically about a murder. According to Melonie, Lori

was telling Jenkins that she had been stupid to "d[o] it to an innocent person" and that Jenkins "shoulda went [sic] after . . . the very people that shot in [her] house." Melonie said that Jenkins yelled, "[T]hat's why he's dead and that's why I killed that . . . ." Melonie also testified that during this argument, Nikko took away Jenkins' revolver, which was black with a wooden handle.

Finally, Easterling also testified at trial that he had seen Jenkins on two or three occasions with a revolver that was black with a wooden handle. He stated that the revolver "looked like a .357."

## 4. PHYSICAL EVIDENCE

The slug found in the ground near Bradford was a Brenneke brand bullet. Brenneke is an uncommon brand in the Omaha metropolitan area. The lead detective investigating Bradford's death was able to find only one store selling the model of Brenneke shotgun shell found at the scene. Police released an image from that store's surveillance video showing the most recent purchaser of the shotgun shells; the purchaser was later identified as Lori.

This information eventually led to Nikko's arrest on or about August 29, 2013. Jenkins, Melonie, and Lori were also arrested around that time period.

When police searched Nikko's apartment on Birch Street in Omaha on August 29, 2013, they discovered a shotgun with a shortened barrel and an assault rifle in a gym bag partially under the bed. These weapons were identified by Lolo at trial as the guns Nikko and Bradford had on the evening of August 18. There was no evidence connecting Jenkins to the apartment.

There was no ballistic evidence at the crime scene near Clark Street, aside from the shotgun slug; the smaller bullet was recovered from Bradford's brain during the autopsy. A firearms and toolmark examiner at the Omaha Police Department crime laboratory testified that the smaller bullet was consistent with

a 9 mm, a .38-, or a .357-caliber bullet. A search of an FBI database containing about 14,000 weapons returned 26 different possible guns that could have fired the bullet. Of those 26, 19 were revolvers and 7 were handguns; 18 were .38's, and 4 were .357's.

DNA analysis matched Bradford as the major contributor among at least three contributors of DNA on the grip and trigger areas of the assault rifle. Bradford also matched the single source of DNA found on the front rail and on the front and rear bolt hole on the right side of the rifle. In addition, Jenkins, Lori, Nikko, Lolo, and Melonie could not be excluded as minor contributors of DNA found on the grip and trigger areas of the assault rifle.

The chances of a person unrelated to Jenkins being a minor contributor of DNA to the grip and trigger areas of the rifle were 1 in 4 for Caucasians, 1 in 5 for African-Americans, and 1 in 5 for American Hispanics. DNA testing on the shotgun could not exclude Nikko as a partial contributor, but tests attempting to match Jenkins, Lori, Melonie, Bradford, and Lolo were inconclusive. According to the forensic DNA analyst's testimony at trial, these statistics are so insignificant that prior to a change in policy in 2010, the laboratory at which she works might not have considered the results informative enough to use in a criminal case.

Swabs from the front rail and from the front and rear bolt hole on the right side of the assault rifle matched Bradford. At trial, Ashley Paggen, a Douglas County Sheriff's Department crime scene investigator who had searched Nikko's girlfriend's car, testified about blood evidence she found. Blood on the front passenger-side floormat also matched Bradford. The DNA expert at trial testified that the chances of a person unrelated to Bradford being the source of these samples was 1 in 11.4 quintillion for Caucasians, 1 in 12.6 quintillion for African-Americans, and 1 in 5.35 quintillion for American Hispanics.

### 5. Excluded Cross-Examination
### of Paggen

During cross-examination, Jenkins attempted to question Paggen about Omaha Police Department and Douglas County Sheriff's Department crime laboratory personnel. At an evidentiary hearing outside the presence of the jury, Jenkins attempted to elicit information about former laboratory director David Kofoed, laboratory director Tracey Ray, and the alleged mishandling of fingerprint evidence by an employee of the Omaha Police Department crime laboratory. The district court excluded the evidence.

## III. ASSIGNMENTS OF ERROR

Jenkins assigns, renumbered and restated, that the district court erred by (1) admitting evidence that Jenkins made a threat to Lori after August 2013, (2) admitting evidence that Jenkins possessed a firearm before and after August 2013, (3) admitting several allegedly gruesome and cumulative photographs of the victim, and (4) excluding testimony by Paggen concerning alleged misconduct by crime laboratory personnel. Jenkins also alleges (5) there was insufficient evidence to support her conviction because of a lack of physical evidence and the credibility of the witnesses.

## IV. STANDARD OF REVIEW

[1] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014) (Rule 404), and the trial court's decision will not be reversed absent an abuse of discretion.[1]

[2,3] An appellate court reviews a trial court's admission of photographs of a victim's body for abuse of discretion.[2] In reviewing a sufficiency of the evidence claim, whether the

---

[1] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[2] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[3]

## V. ANALYSIS

### 1. Alleged Improper Character Evidence

Jenkins' first two assignments of error concern the admissibility of testimony under Rule 404. Specifically, Jenkins challenges the district court's admission of testimony that on occasions other than August 18 and 19, 2013, Jenkins possessed a revolver and that during an argument she threatened to "pop" Lori while in possession of a revolver.

[4] Rule 404(2) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The purpose of Rule 404(2) is that evidence of other acts, despite its relevance, creates the risk of a decision by the trier of fact on an improper basis.[4]

[5] Under Rule 404(3), before a court can admit evidence of an extrinsic act in a criminal case, the State must prove by clear and convincing evidence, outside the presence of the jury, that the defendant committed the extrinsic act.[5] The proponent of evidence offered pursuant to Rule 404(2) is, upon objection to its admissibility, required to state on the

---

[3] *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

[4] *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

[5] *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012).

record the specific purpose or purposes for which the evidence is being offered, and the trial court is required to state on the record the purpose or purposes for which such evidence is received.[6]

### (a) Jenkins' Threats Toward Lori

In Jenkins' first assignment of error, she argues that the district court improperly admitted evidence—without a hearing—that Jenkins threatened Lori. We do not agree that Rule 404(2) applies in this instance.

Lolo and Melonie both testified about an argument during which Jenkins yelled about shooting or killing somebody. Lolo testified at trial that Jenkins said she would "pop that bitch like I [Jenkins] popped that nigga." The district court overruled Jenkins' continuing relevance and Rule 404 objections to both Melonie's and Lolo's testimonies about the incident.

Here, the State offered Jenkins' statement to prove that Jenkins had killed Bradford. The testimony was evidence of the very crime with which Jenkins was charged. Jenkins made reference to a person she had "popped" or shot. Given the context provided by witnesses, a rational trier of fact could have easily interpreted the statement as an admission by Jenkins that she shot Bradford.

[6] Direct evidence of a charged crime is not an extrinsic act that is subject to exclusion under Rule 404(2).[7] For example, courts treat a jailhouse confession as direct evidence of guilt, not an extrinsic bad act.[8] Similarly, in *State v. Canbaz*,[9] the defendant told his neighbors and coworkers before he

---

[6] *Glazebrook, supra* note 4.

[7] See, e.g., *U.S. v. Adkins*, 743 F.3d 176 (7th Cir. 2014); *U.S. v. Hsu*, 669 F.3d 112 (2d Cir. 2012); *U.S. v. Washington*, 12 F.3d 1128 (D.C. Cir. 1994).

[8] See, e.g., *U.S. v. Williams*, 612 F.3d 417 (6th Cir. 2010).

[9] *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000).

killed the victim that he wanted to kill the victim and her family members and that he intended to do so. But at trial, his defense was that he did not premeditate the murder. We held that the evidence was relevant to prove the intent and premeditation elements of first degree murder and not an extrinsic bad act. In other words, his statements were direct evidence of these two elements of the charged crime.

Jenkins made this statement while she was in possession of a handgun, and her possession of the gun was itself a crime. But the prosecutor could not extricate her admission to shooting Bradford from the facts explaining why she would have made the statement. Jenkin's admission was highly probative of her identity as the perpetrator of this crime, and the proof did not depend on showing that she acted in conformity with a character trait.

On these facts, there is no risk that the jury rested its determination on an improper basis; instead, the jury was merely presented with evidence that Jenkins committed the crime charged. We decline to exclude such a probative admission by the accused merely because the admission was clothed in threatening language.

### (b) Jenkins' Alleged Possession of Revolver

In Jenkins' second assignment of error, she claims the court should have excluded certain testimony that she had possessed a revolver before and after Bradford's death. In the second assignment of error, we also consider evidence that Jenkins possessed a revolver during the argument with Lori discussed above. Jenkins alleges that as with her first assignment of error, this testimony was inadmissible prior acts evidence. Even if this evidence might arguably be offered to prove propensity, we find that any error in its admission was harmless.

[7,8] In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the

inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error.[10] Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[11]

At trial, Jenkins objected to testimony by Lolo and Melonie concerning Jenkins' possession of a revolver during an argument with Lori. In addition, Jenkins objected when Melonie testified about two other occasions on which she saw Jenkins with a revolver. However, Easterling testified at trial that he had seen Jenkins with a revolver on two or three occasions. Jenkins did not object to Easterling's testimony.

Assuming without deciding that it was error for the district court to overrule Jenkins' objections to the testimony by Lolo and Melonie, the error was harmless. Had Lolo's and Melonie's allegations been excluded, the jury still would have heard Easterling's testimony about Jenkins' possession of the revolver. Therefore, we conclude that the jury's findings cannot be attributed to the admission of Lolo's and Melonie's testimonies about the revolver.

Jenkins' second assignment of error lacks merit.

## 2. Crime Scene and Autopsy
### Photographs

In Jenkins' third assignment of error, she challenges the admission of seven photographic exhibits of Bradford's body. At trial, Jenkins objected to exhibit 8 as prejudicial under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008) (Rule 403), and to exhibits 26, 31, 32, 95, 96, and 97 as both prejudicial and cumulative under Rule 403.

---

[10] *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016).

[11] *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002).

[9-11] Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[12] In addition, a trial court may exclude evidence if it is needlessly cumulative. The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[13] If a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if gruesome.[14] In a homicide prosecution, a court may receive photographs of a victim into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[15]

Exhibits 8, 26, 31, and 32 depict, from different angles, Bradford's wounds at the crime scene. Exhibits 95, 96, and 97 are photographs from Bradford's autopsy. Jenkins claims that the photographs are extremely gruesome and therefore prejudiced her with the jury. In addition, she asserts that exhibits 26, 31, 32, 95, 96, and 97 are cumulative because the jury could have guessed what Bradford's injuries were based upon testimony and other exhibits that depicted the position of Bradford's body, blood spatter, and ballistic evidence at the crime scene. Finally, Jenkins argues that these exhibits were not probative, because Jenkins did not challenge cause of death at trial.

The contested exhibits were highly probative and properly admitted, despite their gruesome nature. We acknowledge that the injuries Bradford suffered, particularly the hollow, gaping exit wound in his forehead, are difficult to view.

---

[12] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[13] *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013).

[14] *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006).

[15] *Bauldwin, supra* note 12.

However, gruesome crimes produce gruesome photographs.[16] The fact that a defendant stands accused of a gruesome crime should not limit the State's ability to prove the nature of the crime committed.

Further, each photograph presented at trial served to assist witnesses in their testimony, and also tended to prove cause of death, Bradford's identity, and Jenkins' intent. No two photographs were the same. Other exhibits depicting the crime scene do not show Bradford's wounds—leaving essential information to the imagination of the jury. Thus, the exhibits were not cumulative.

Nor are we persuaded by Jenkins' argument that the district court should have excluded these exhibits because Jenkins did not contest the cause of Bradford's death. There was no stipulation in the record to this fact, and, as such, the State was required to prove, beyond a reasonable doubt, that Bradford was murdered and, for purposes of the weapons charges against Jenkins, that Bradford was killed with firearms. The State chose to admit these noncumulative photographs to meet that burden. For these reasons, Jenkins' third assignment of error is without merit.

### 3. EVIDENCE ALLEGEDLY DISCREDITING CRIME LABORATORY

In Jenkins' fourth assignment of error, she argues that the district court erred by prohibiting Jenkins from pursuing a particular line of questioning during cross-examination of Paggen. Jenkins claims that this line of questioning was impeachment and that by excluding the evidence, the district court infringed upon her constitutional right to cross-examine witnesses under the Sixth Amendment to the U.S. Constitution.

[12] The Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him or her. The main and essential

---

[16] *Dubray, supra* note 2.

purpose of confrontation is to secure the opportunity for cross-examination.[17] An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.[18]

In the case at bar, Jenkins attempted to question Paggen about the credibility of the Douglas County Sheriff's Department's investigation. Specifically, in an offer of proof outside the presence of the jury, Paggen testified that she had read an article about an Omaha Police Department employee—not affiliated with the Douglas County Sheriff's Department—misidentifying a fingerprint. Additionally, Paggen stated that she heard a rumor that her former supervisor at the Douglas County Sheriff's Department crime laboratory was on investigatory leave for an unknown reason. Finally, Paggen had learned that a former employee of the Douglas County sheriff's office, who did not work there at the same time as Paggen, had been convicted of a crime relating to the collection of blood evidence from a vehicle.

But we find that the jury would not have received a significantly different impression of Paggen's credibility if Jenkins were permitted to present this evidence. Jenkins' line of cross-examination questioning was not a proper impeachment, because it had nothing to do with Paggen's credibility or that of another witness. Instead, Jenkins sought to discredit Paggen by weak associations to people with whom she was either barely familiar or did not know at all. All of Jenkins' questions called for Paggen to testify about events beyond her personal knowledge. This testimony was speculative and

---

[17] *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

[18] *State v. Poe*, 276 Neb. 258, 754 N.W.2d 393 (2008).

irrelevant to Paggen's credibility. Therefore, we cannot say that the district court abused its discretion by excluding this immaterial line of questioning.

For these reasons, Jenkins' fourth assignment of error is without merit.

### 4. Sufficiency of Evidence

Finally, in Jenkins' fifth assignment of error, she claims the evidence at trial was insufficient to support her convictions. Jenkins' argument, in essence, is that none of the witnesses against her were credible because the witnesses had criminal histories. Further, Jenkins claims that the relatively inconclusive DNA evidence in this case should have precluded conviction. We disagree.

[13,14] The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[19] An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition.[20]

Viewed in the light most favorable to the State, without evaluating witness credibility, we hold that there was sufficient evidence to support Jenkins' convictions. Testimony at Jenkins' trial could have led a rational juror to find, beyond a reasonable doubt, every element of the crimes for which Jenkins was convicted. Therefore, Jenkins' final assignment of error is without merit.

### VI. CONCLUSION

The judgment of the district court is affirmed.

Affirmed.

---

[19] *Hale, supra* note 3.

[20] *State v. Lee*, 290 Neb. 601, 861 N.W.2d 393 (2015).