IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. COOK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHELSEY COOK, APPELLANT.

Filed August 22, 2017.    No.  A-16-923.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Following a bench trial, the district court found Chelsey Cook guilty of child abuse resulting in death. On appeal, Cook argues there was insufficient evidence to support her conviction and that she received ineffective assistance of counsel. For the reasons set forth below, we affirm.

## II. BACKGROUND

On December 30, 2014, Lakisha Morrow and Cook executed a notarized agreement, wherein Morrow agreed to relinquish her parental rights to her three year old daughter, Alicia. Cook agreed to assume the parental rights of Alicia for purposes of adoption. From the time of the executed agreement until Alicia's death, Cook represented Alicia to be her daughter. In addition

to Alicia, Cook cared for her two year old biological son, T.W. At the time of the incident, Cook was 24 years old, a high school graduate, and had some beauty school training.

Detective Thomas Queen testified at trial regarding the state of 3025 Franklin Street residence the evening Alicia was discovered. Detective Queen testified that the inside of the residence was as cold as the outdoor temperature, 32 degrees. Detective Queen testified that the first floor of the residence was sparsely furnished. The living room contained a sectional, a disassembled table, television, television stand, and some DVDs. The dining room was completely unfurnished. The kitchen cupboards and cabinets were completely empty. However, Detective Queen testified that there were some fast food wrappers and uneaten food in a trash bag in the kitchen and there were some packages of ramen noodles on the kitchen counter. Otherwise, the kitchen was empty. The second floor of the residence had four bedrooms. Three of the bedrooms were completely unfurnished. One bedroom had a mattress and box spring leaning against one of the walls and a space heater in the room. There were no other auxiliary heaters on the second floor.

Detective Wendi Dye testified as to Cook's description of the events leading up to Alicia's death. Detective Dye began by asking Cook biographical information. Cook had worked at Walgreens since July 2015. She stated that she worked the night shift from 10 p.m. until 8 a.m. She worked a one-week on, one-week off shift. Cook stated that she had two children, T.W. and Alicia. She stated that the last time Cook had seen Alicia's biological mother was the day after Easter in 2015. Cook informed Detective Dye that Lakisha Morrow had executed a notarized document giving custody of Alicia to Cook. Cook stated that she had lived at 3025 Franklin Street for approximately two years. Her grandparents owned the home and allowed her and the children to live there rent free. Cook had enrolled Alicia in a Head Start program at Kennedy Elementary beginning in October 2015. Cook had an overnight childcare provider for the children while she was at work. Cook received state aid for childcare expenses for both Alicia and T.W.

Detective Dye then began asking Cook about the circumstances that precipitated Alicia's death. Cook informed Detective Dye that between 9 a.m. and noon on January 2, 2016, Cook, T.W., and Alicia were reading books. Cook wanted Alicia to write her name, but Alicia refused. Cook stated that "until she figured it out, good-bye." Cook stated that she did not want to speak with Alicia and Alicia did not want to speak with her. Alicia went to another bedroom, located nearest to the attic.

Later on during the day, Cook sent T.W. to ask if Alicia wanted anything to eat. Cook stated that her son told her Alicia had refused food. Cook stated that Alicia had not eaten anything that day and had drank only a little bit of water. Cook and her son spent the rest of the day in the bedroom that was furnished with a mattress and space heater. Cook stated she had no contact with Alicia between sending her from the bedroom that morning until falling asleep. She testified that she fell asleep at approximately 6 p.m. with her son present. Cook stated she woke up at approximately 12:44 a.m. on January. She stated she went to the restroom and noticed the house was very cold. When she returned to the room where she and T.W. had been sleeping, she noticed that Alicia was not there. Cook informed Detective Dye that the pilot light in the furnace had a tendency to go out, requiring her to relight it. She stated that when the pilot light went out, the furnace would blow cold air and the house would get as cold as the outside temperature. Cook kept a space heater operating in the bedroom where she and T.W. had been sleeping, however.

Cook searched for Alicia and found her in the bedroom next to the attic. Alicia was not wearing any clothes. According to Cook, it was not uncommon for her children not to wear clothes. She stated that she does not believe that clothes keep people warm. She stated that upon finding Alicia she noted that Alicia was not speaking. Cook knew that she was alive because she was blinking her eyes. Cook told Alicia to get up, but Alicia was stumbling and falling when she attempted to get up. Alicia also made a moaning sound. Cook told Alicia that "this was not a joke" and then picked her up and brought her into the bedroom with the space heater. Cook tried to wake Alicia up in this room, but was unsuccessful. Cook thought Alicia might have been thirsty, and attempted to give her some soda to drink. She poured the soda into Alicia's mouth and observed it come out of Alicia's nose. Cook then moved Alicia closer to the space heater in the bedroom and began rubbing her to try and warm her up. Cook described Alicia as freezing to the touch. Cook wrapped Alicia in a blanket and thought she was getting warmer. At that point, Cook stated that she was scared so she went into another bedroom with her Bible and prayed for Alicia to get better.

Shortly thereafter, Cook stated that T.W. started to wake up, so she took him downstairs and made him a pizza. Cook checked on Alicia while the pizza was cooking and stated that she could hear a heartbeat and see that Alicia was still breathing. Cook then went to the basement to light the pilot light on the furnace. While downstairs, Cook read T.W. a book and put him back to sleep on the living room sofa. Cook then went to the back upstairs bedroom to check on Alicia. Cook stated that Alicia's chest was not moving when she returned. Cook believed that she felt a heartbeat, so she went into another bedroom to pray. Cook returned to the room Alicia was occupying and noticed her arm had moved. Cook thought this meant that Alicia was fine, so she went to the other bedroom to pray more. Cook returned once more and listened for Alicia's heartbeat. Cook stated that this time Alicia's heartbeat sounded faint. Cook realized that she was not hearing Alicia's heartbeat, but was hearing her own heartbeat. Cook stated that she realized Alicia was deceased at approximately 1:30 a.m.

Cook left Alicia in the bedroom and went downstairs. Cook stated she laid awake next to her son for hours. Cook stated that she did not do anything until 8 a.m. At that time, Cook was afraid that T.W. would see Alicia's body or that the body would start to smell. Cook wrapped Alicia in a plastic bag that was covering the mattress, along with the blanket that was covering her. Cook carried Alicia downstairs and placed her in the closet beneath the stairs where she would remain until paramedics arrived on the scene two days later. Cook told Detective Dye that she did not call 911 because she thought Alicia would "come back." She also stated that she knew she had a warrant for driving under suspension. She was afraid that if Alicia was taken to the hospital the authorities would arrest her and T.W. would be placed in foster care.

After placing Alicia's body in the basement, Cook stated that on January 3, 2016, at approximately 9 a.m. she and T.W. went to the gas station. They then went to attend church services at two separate churches. Cook stated that she went to church to "get the word." Cook stated that after the service at the second church, she went with Stella Cooper to Walgreens and then to Cooper's home. Cooper asked where Alicia was, and Cook responded that she was with a friend. Cook had dinner with Cooper and then went to the home of her grandmother, Charlie Miles. Cook and T.W. stayed the night at Miles' home.

On January 4, 2016, Cook woke up and Miles asked where Alicia was, Cook told her she was with a friend. Cook stayed at Miles' home with T.W. until the night of January 4, 2016. At approximately 9:40 p.m. Cook dropped T.W. off at daycare. The daycare provider also asked where Alicia was. Cook responded that someone else would be taking care of her from then on. Cook then worked her night shift that evening.

On the morning of January 5, 2016, Cook picked up T.W. from childcare and went to Miles' home. Later that morning, Cook spoke to her mother, Delena Winston, by telephone. Winston lived in Chicago. Cook asked her to come to Omaha because she needed to speak with her. Winston agreed to come to Omaha. Cook's brother, Anthony Orr, came over to Miles' home and took Cook and T.W. to the library from approximately 11 a.m. until 1 p.m., where Cook utilized her Facebook account. Orr asked where Alicia was. Cook stated she was with a friend. After leaving the library with Orr, Cook went to a beauty supply store and then to a Baker's supermarket. Cook then went to Orr's house in Millard where she and T.W. took a nap. At approximately 8:30 p.m. Cook's brother woke her up and informed her that their mother was in town. They proceeded to Miles' home, where Winston, Miles, and Cook's father, Kevin Cook, were gathered.

At that time Cook told the gathered individuals that Alicia was still at the Franklin Street home. Cook informed them that Alicia was dead. Orr, Kevin Cook, and Cook drove to the Franklin Street home where Kevin Cook kicked in the door. Cook informed her father that Alicia was in the closet under the stairs. Orr and Kevin Cook discovered Alicia and Orr called 911.

Paramedics and police officers responded to the 911 call. Paramedics discovered the body of four year old Alicia in a storage area underneath the stairs leading to the basement. Alicia's body was wrapped in a blanket and plastic mattress bag. Alicia was discovered naked with the exception of wearing a pair of ankle socks. An autopsy was performed on January 6, 2016. The pathologist, Dr. Michelle Elieff, concluded that Alicia had died as a result of hypothermia.

At trial the State called numerous family members and acquaintances of Cook, a paramedic, police officers, forensic technicians, and three medical doctors. Cook called one medical doctor to testify in her defense. The paramedic and police officers' testimony revolved around the factual background and investigation detailed above. Additionally, numerous detectives testified that the house was as cold as the outdoor temperature. Detective Queen had a furnace technician come to the scene to fix and assess the furnace. The furnace technician stated the furnace was a relic, but it had been serviced in November 2015.

The family members and acquaintances of Cook testified about Cook's parenting abilities and their interactions with Cook and her children. No witness testified that they had ever seen Cook strike either of the children. With one exception, no witness testified that they believed Cook neglected or deprived the children of necessities. One witness, Tyesha Brown, did express concern regarding Cook's children not having appropriate winter clothing. Brown, whose son's biological father was also T.W.'s father, stated that the children's paternal grandparents had to buy winter coats for Cook's children. Otherwise, the witnesses testified that Cook and her children were generally happy.

Dr. Jamie Drake, a pediatrician at Children's Hospital, testified that she saw Alicia once in April 2015 for a well-child visit. Dr. Drake stated that Alicia appeared to be a healthy three year old at the time of the visit. Dr. Drake noted no injuries or particular causes for concern.

Dr. Michelle Elieff, a forensic pathologist, testified regarding the autopsy performed on Alicia. Dr. Elieff detailed her autopsy procedure. She described several irregular scars on Alicia's torso, buttocks, and thighs. Dr. Elieff was concerned that these scars were from past inflicted injuries. However, Dr. Elieff testified that none of the scars or more recent injuries were the cause of Alicia's death. Additionally, Dr. Elieff was unable to determine the time period in which the injuries, and resulting scars, would have been incurred.

After performing the external examination, Dr. Elieff proceeded to draw fluids from the body in order to perform toxicology analyses. The toxicology results were negative for any agent that would have resulted in death. Then, Dr. Elieff systematically removed each organ in order to examine it for any injury, disease, or congenital abnormality. Dr. Elieff testified that she did not discover evidence of any congenital disorder, any disease, or injury that would have caused death. Finally, Dr. Elieff performed x rays of the body and microscopic examination of tissue samples, both of which did not indicate any irregularities. Based on Dr. Eleiff's autopsy, she was able to determine with a reasonable degree of medical certainty that Alicia's cause of death was hypothermia.

Dr. Elieff described hypothermia as a medical condition that can result in death. Dr. Elieff testified that hypothermia involves the lowering of the body temperature such that the cells, organs, and tissues of the body lose their ability to respond. She testified that hypothermia can result from temperatures that are not necessarily freezing. Hypothermia varies from person to person based on a number of factors, including, body size, nutrition, any underlying medical condition, the amount and nature of the clothing they are wearing, whether they are damp, whether it is drafty, and whether there is immersion in water. Dr. Elieff testified that a person can succumb to hypothermia in temperatures under 50 degrees. She testified that the time it takes for a person to succumb to hypothermia depends on how cold the actual temperature gets and the duration of time a person is exposed to that temperature in combination with the personal variations listed previously. Dr. Elieff testified that young people are more susceptible to hypothermia because their surface volume to weight makes them more affected by changes in temperature extremes. Dr. Elieff testified that hypothermia initially presents in a person as a gradual slowing down of the body. The person may become confused and not be able to respond to commands or questions. A person may stumble around and not respond to their environmental surroundings. Dr. Elieff testified that hypothermia progresses in stages. After the initial confusion stage, a person may not be able to drink or breathe properly. A person may not be able to urinate. Their body temperature, pulse, and blood pressure lower. Dr. Elieff stated that as time passes, the symptoms become more severe.

Dr. Elieff testified that hypothermia is treatable, as well as preventable. She testified that it can be prevented through adequate clothing, shelter, and proper nutrition. Dr. Elieff testified that a reasonable layperson witnessing the symptoms of hypothermia stated above would be able to determine that emergency medical treatment was needed for that individual. She testified that the earlier hypothermia is treated, the more likely a person is to survive. She testified that the type of treatment administered is dependent on the stage. In the early stages, a person is monitored and

treated with electrochemicals. As the stages progress, a person will require intravenous fluids and close monitoring by medical professionals.

On cross-examination, Dr. Elieff was questioned about whether a person without medical training, and limited education, could recognize the symptoms of hypothermia. Dr. Elieff testified that a person without medical training should recognize the symptoms as needing to be treated by a medical professional. Dr. Elieff also stated that children have been able to call 911 when they have recognized that a person was in distress.

The final medical expert called by the State was Dr. Suzanne Haney. Dr. Haney is employed at Children's Hospital and Project Harmony as a child abuse pediatrician and medical director of the children's advocacy team. Dr. Haney is board-certified in pediatrics and child abuse pediatrics. Dr. Haney testified that she has personally treated patients with hypothermia. Dr. Haney testified that she had treated five to six cases of hypothermia and all of the patients had survived. The most recent case Dr. Haney treated had presented comatose and nearly unresponsive.

Dr. Haney described the symptoms and treatment of hypothermia very similarly to Dr. Elieff. Dr. Haney testified that hypothermia progresses in stages and that the earlier the treatment, the more likely a patient is to survive. Dr. Haney testified that the symptoms of hypothermia should alert a reasonable person that something is wrong with the person suffering from the symptoms. Dr. Haney testified that a reasonable person would seek medical care for a person they observed suffering from the hypothermia-like symptoms.

Dr. Haney testified that she reviewed literature regarding hypothermia in children and its treatability. Dr. Haney testified that the literature demonstrates that hypothermia in children is very treatable. Dr. Haney reviewed multiple cases of children that were unresponsive or even without a heartbeat for hours who were completely resuscitated. When posed a hypothetical with the facts of this case, Dr. Haney testified that if the child received immediate medical care, the child's chance of survival would be "very, very good." Dr. Haney testified that unless there was some other condition, there was a "90, 95 or more percent chance of survival."

On cross-examination, Cook's counsel questioned Dr. Haney regarding the verbiage of her report. Dr. Haney testified that her report stated "it is distinctly possible that had [Cook] sought care at that time Alicia would have survived." When Cook questioned Dr. Haney regarding the difference between a 95 percent probability and a distinct possibility of survival, Dr. Haney testified that the percentage was consistent with her written report. Cook also questioned Dr. Haney's opinion given to Detective Dye prior to trial about whether Alicia would have survived. Dr. Haney testified that the opinion given to Detective Dye was based on the information presented to her at that time. On re-direct examination, Dr. Haney testified that her intent as to Alicia's probability was the same in her written report as her testimony of 90 to 95 percent probability of survival.

The only witness called by Cook was Dr. Richard Forsman. Dr. Forsman has practiced as a doctor of internal medicine since 1970. Dr. Forsman reviewed the autopsy report prepared by Dr. Elieff and the report prepared by Dr. Haney. Dr. Forsman initially testified that no doctor could state with a reasonable degree of medical certainty that a child under Alicia's circumstances that night could have survived if she received prompt medical attention that early morning.

On cross-examination, Dr. Forsman conceded that he had never treated a person with hypothermia, he was not familiar with the stages of hypothermia, and he had not reviewed the research regarding the successful treatment of hypothermia. Dr. Forsman also testified that a layperson observing Alicia's described symptoms that early morning would be able to determine that she needed medical assistance. On re-direct examination, Dr. Forsman testified that based on Alicia's circumstances described to him, that even if she had received medical care, he believed that Alicia's probability of survival "was not very good." On re-cross examination, Dr. Forsman again testified that he was not familiar with the stages of hypothermia, had not done any research on hypothermia, had not read the police reports associated with the case, and had not read Cook's statements about the circumstances surrounding Alicia's death.

After the close of evidence, the district court found Cook guilty of intentional child abuse resulting in death. Prior to the announcement of its verdict, the district court stated that the autopsy photographs received into evidence depicting the exterior of Alicia's body were considered only for the limited purpose of ruling out alternative causes of death, as testified by the pathologist, and for no other reason. The district court also stated that Cook's statements to law enforcement officers were made freely and voluntarily. The district court enunciated some of its reasoning for the decision, including "The defendant's failure to monitor the health and well-being of Alicia [M.] under the circumstances was done knowingly and intentionally and was the proximate cause of Alicia [M.'s] hypothermia, and eventually, her death.

After trial, Cook filed a motion for a new trial on July 20, 2016. The district court overruled the motion in an order filed on August 8, 2016. Cook then filed the instant appeal.

## III. ASSIGNMENTS OF ERROR

Cook asserts that the district court erred in finding the evidence sufficient to support a guilty verdict beyond a reasonable doubt. She further alleges that her trial counsel was ineffective.

## IV. STANDARD OF REVIEW

The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance? *Id.*

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Cook was convicted of a violation of Neb. Rev. Stat. § 28-707 (Reissue 2016), which provides that a person is guilty of child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be placed in a situation that endangers his or her life or physical or mental health or to be deprived of necessary food, clothing, shelter, or care. Subsection (6) of the statute provides that child abuse is a Class IB felony "if the offense is committed knowingly and intentionally and results in the death of such child." *Id.* Child abuse resulting in death requires proof of the defendant's intent to commit child abuse, as defined in Neb. Rev. Stat. § 28-707, but it does not require proof that the defendant intended to kill the minor child. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

Cook argues that her conviction was not supported by relevant evidence because the district court explicitly found that Cook's actions prior to 12:45 a.m. were the proximate cause of her death. Cook argues that the State's theory of the case revolved around Cook's actions after she discovered Alicia at 12:45 a.m., and thus, there was insufficient evidence for the district court to find Cook guilty based on its explicit findings. She further asserts that the furnace blowing out in the night was an intervening cause and the proximate cause of Alicia's death. We disagree.

As stated above, when a defendant argues that there was insufficient evidence to support a conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. This standard is applied to both jury and bench trials. Cook urges this court to evaluate only the rationale enunciated by the district court in reaching its decision. However, the district court, as any fact finder in a criminal case, was not required to set forth all or any of its reasoning in reaching its decision. Cook has pointed out no case law which would require us to deviate from the standard of review that is given to all verdicts in criminal cases. We must determine, viewing all of the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The evidence demonstrates that sometime between the hours of 9 a.m. and 12 p.m. on January 2, 2016, Cook, T.W., and Alicia were reading books. Cook wanted Alicia to write her name, but Alicia refused. Cook stated that "until she figured it out, good-bye." Cook stated that she did not want to speak with Alicia and Alicia did not want to speak with her. Alicia went to an empty bedroom, located nearest to the attic. Later on during the day, Cook sent her two year old son to ask if Alicia wanted anything to eat. Cook stated that T.W. told her Alicia had refused food. Cook stated that Alicia had not eaten anything that day and had drank only a little bit of water. Cook and T.W. spent the rest of the day in the bedroom they had occupied for most of the day. Cook stated she fell asleep at approximately 6 p.m. with her son.

Cook, by her own statements, did not personally check on Alicia for at least six hours, and up to nine hours, before going to sleep. Alicia did not have any clothes on with the exception of her anklet socks. She had not eaten anything. Cook knew that the pilot light in the furnace had a history of blowing out, causing the house to be as cold as the outside temperature.

According to Cook's own statement, she had no personal contact with Alicia until 12:45 a.m. the next morning when she discovered Alicia essentially naked in the room nearest the attic. Cook admitted that Alicia was not wearing any clothes, a condition that was not unusual in her household. She stated that Alicia was not speaking, but that Cook knew that she was alive because she was blinking. Cook told Alicia to get up. After noting that Alicia could not walk on her own, Cook picked Alicia up and brought her into the room with the space heater. Cook tried to wake Alicia up in this room, but was unsuccessful. Cook thought Alicia might have been thirsty, so she tried to give her some soda to drink. Cook stated the soda came out of Alicia's nose. Cook then moved Alicia in front of the space heater in the room and began rubbing her to try and warm her up. Cook described Alicia as freezing to the touch. Cook wrapped Alicia in a blanket and believed she was getting warmer.

At this point, Cook was scared and left Alicia in the room. When T.W. began to wake up, Cook took him to the first floor of the house, cooked him a pizza, and thereafter re-lit the pilot light in the furnace. She checked on Alicia while the pizza was cooking and then again after the pilot light was re-lit. Drs. Elieff, Haney, and Forsman testified that a reasonable person would have sought medical attention if they observed the symptoms Alicia was displaying. Cook did not seek medical attention for Alicia. Cook stated that she did not have an operating cell phone or vehicle. She also stated that she was worried that if she took Alicia to the hospital, she would be arrested on a warrant and T.W. would be placed in foster care. Her concerns for herself and T.W. clearly outweighed her concerns for Alicia's health. Dr. Haney testified based on Alicia's symptoms that there was a 90 to 95 percent chance that Alicia would have survived if Cook had sought medical care. Cook did not seek medical care. After Cook realized that Alicia had died, she wrapped her in the blanket and plastic mattress covering and put her in a closet underneath the stairs. Cook then carried on her life as normal for two more days.

Viewing the evidence in the light most favorable to the prosecution, any rational finder of fact could have determined that Cook intentionally deprived Alicia of necessary clothing, shelter, or care, which resulted in her death. We find that the district court did not err by finding sufficient evidence to determine Cook committed the elements of the charged crime beyond a reasonable doubt.

2. INEFFECTIVE ASSISTANCE OF COUNSEL

Cook argues that her trial counsel's performance fell below the standard of a reasonable attorney under the same circumstances because trial counsel failed to raise proper evidentiary objections, "opened the door" to damaging testimony that otherwise would not have been adduced, failed to educate himself and effectively cross-examine the State's expert witness, and retained an improper expert witness with no relevant experience to the facts of the case. We disagree.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.* The prejudice prong of the ineffective

assistance of counsel test requires that the defendant show a reasonable probability that but for counsel's deficient performance, the result of the proceeding in question would have been different. *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017). Cook is represented on direct appeal by different counsel than the counsel who represented her at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Ash, supra*. Otherwise, the issue will be procedurally barred. *Id.* An ineffective assistance of counsel claim is raised on direct appeal when allegations of deficient performance are made with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.*

(a) Evidentiary Issues

Cook argues that her trial counsel's performance was deficient and this deficiency resulted in prejudice because trial counsel failed to object to prejudicial evidence and trial counsel "opened the door" to prejudicial evidence with his examination of witnesses. Specifically, Cook argues that trial counsel failed to object to improper character testimony from Mack with regard to the care of Alicia, object to testimony regarding previous injuries on Alicia's body that posited an inference of physical abuse, and opened the door to testimony about Alicia's school attendance, Cook's receipt of welfare, and whether Cook placed the children in car seats.

In a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence in a case tried without a jury. *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009). There is no indication that the district court relied upon any of the evidence alleged to have been received due to trial counsel's ineffective performance in determining its verdict. Likewise, there is no evidence that trial counsel's performance as to evidentiary matters prejudiced Cook. As for Cook's argument that trial counsel's failure to object to the implication of past inflicted injuries on Alicia's body, the district court explicitly stated the autopsy photographs received into evidence depicting the exterior of Alicia's body were considered only for the limited purpose of ruling out alternative causes of death, as testified by the pathologist, and for no other reason. Therefore, we find that Cook's trial counsel's performance with regard to evidentiary issues was not deficient. Even if we presumed that all of the complained of evidence was improperly received, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

### (b) Cross-Examination of Expert

Cook argues that her trial counsel was ineffective in failing to effectively cross-examine Dr. Haney regarding her opinion that Alicia most likely could have been saved if she received immediate medical care when Cook discovered her. Specifically, Cook argues that trial counsel was deficient in his examination of Dr. Haney because he focused on semantic differences between Dr. Haney's testimony and Dr. Haney's report. Additionally, Cook argues that trial counsel should have impeached Dr. Haney with her previous statements to Detective Dye before the preliminary hearing when Detective Dye asked Dr. Haney about Alicia's chance of survival over the telephone. Finally, Cook argues that trial counsel's cross-examination of Dr. Haney's literature review and overall opinion was deficient.

We find that Cook's arguments are without merit since she cannot demonstrate prejudice based on counsel's allegedly deficient cross-examination. Even if Dr. Haney's testimony that Alicia would most likely have been saved if she received immediate medical care when Cook discovered her were discarded, there was still sufficient evidence to support the district court's verdict. The State presented sufficient evidence to satisfy all of the elements of the offense even disregarding the complained of opinion of Dr. Haney. Therefore, we find that Cook can demonstrate no prejudice by way of counsel's allegedly deficient cross-examination.

### (c) Remaining Assigned Errors

Cook concedes that her final two claims of ineffective assistance of counsel do not have a sufficient record on direct appeal. The record does not demonstrate whether trial counsel failed to depose Dr. Haney nor to what information a different defense expert well-versed regarding hypothermia would have testified to at a trial. Therefore, these claims cannot be resolved on direct appeal. See, *State v. Loding, supra*.

## VI. CONCLUSION

We conclude the district court did not err by finding the evidence sufficient to support a guilty verdict beyond a reasonable doubt. We also conclude that Cook was not denied effective assistance of counsel for the claims which we have an adequate record to review.

AFFIRMED.